1

2

3

4

5

6

7

8

9

10

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

11 | BRADLEY JOHNSON,                     CASE NO. 07cv783 BEN (NLS)

12 |                          Plaintiff,  **DECISION GRANTING PLAINTIFF'S MOTION FOR**

      vs.                                **SUMMARY JUDGMENT and**

13 |                                      **DENYING DEFENDANTS'**

14 | POWAY UNIFIED SCHOOL DISTRICT, et    **MOTION FOR SUMMARY**

      al.,                               **JUDGMENT**

15 |                          Defendants.

16

17         May a school district censor a high school teacher's expression because it refers to Judeo-

18 Christian views while allowing other teachers to express views on a number of controversial

19 subjects, including religion and anti-religion?  On undisputed evidence, this Court holds that it

20 may not.

21         Courts should not quickly intervene in the daily operation of schools and school systems,

22 for that task is committed primarily to local school boards.  However, in the proper case, federal

23 courts "have not failed to apply the First Amendment's mandate in our educational system where

24 essential to safeguard the fundamental values of freedom of speech and inquiry and of belief."

25 *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968).  "'The vigilant protection of constitutional

26 freedoms is nowhere more vital than in the community of American schools.'" *Id.* (quoting

27 *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)).  Because it has been clear for over 90 years that

28 teachers do not lose their constitutional rights inside the schoolhouse gate, and that government

1  may not squelch one viewpoint while favoring another, the Poway Unified School District violated

2  Plaintiff's rights when it insisted that Plaintiff remove his two classroom banners.

3       Public schools play an important role educating and guiding our youth through the

4  marketplace of ideas and instilling national values.  One method used by the Poway Unified

5  School District to accomplish this task is to permit students to be exposed to the rich diversity of

6  backgrounds and opinions held by high school faculty.  In this way, the school district goes

7  beyond the cramped view of selecting curriculum and hiring teacher speech to simply deliver the

8  approved content of scholastic orthodoxy.  By opening classroom walls to the non-disruptive

9  expression of all its teachers, the district provides students with a healthy exposure to the diverse

10  ideas and opinions of its individual teachers.  Fostering diversity, however, does not mean

11  bleaching out historical religious expression or mainstream morality.  By squelching only

12  Johnson's patriotic and religious classroom banners, while permitting other diverse religious and

13  anti-religious classroom displays, the school district does a disservice to the students of Westview

14  High School and the federal and state constitutions do not permit this one-sided censorship.

15       The case is before the Court on cross-motions for summary judgment.  The Plaintiff is a

16  high school math teacher, Bradley Johnson.  Johnson's Amended Complaint seeks summary

17  judgment on his claims under the First Amendment of the U.S. Constitution and under Article I,

18  Sections 2 and 4 of the California Constitution.  He seeks a court order requiring the school district

19  to permit re-hanging of the banners.  He does not seek money damages (other than nominal

20  damages).  The Defendants are the Poway Unified School District, the Principal of Westview High

21  School (where Johnson teaches), the Superintendent and Assistant Superintendent, and the

22  members of the district board of education.  The individual Defendants are sued in their official

23  and individual capacities.

24       For the reasons that follow, summary judgment is granted in favor of Plaintiff and against

25  the several Defendants.

26                    **I.  MOTION FOR SUMMARY JUDGMENT STANDARD**

27       The legal standards to be applied to a motion for summary judgment are well known.

28  Summary judgment is appropriate where the record demonstrates that there is no genuine issue of

1   material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P.  56(c);

2   *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

3   248 (1986); *Farrakhan v. Gregoire*, 590 F.3d 989, 1003-04 (9th Cir. 2010).

## II.  FACTS

5         The facts are largely undisputed.

6         Johnson is employed as a public high school math teacher.  He has taught math to students

7   in the Poway Unified School District for 30 years and is he is a well-respected teacher.  He

8   currently is teaching at Westview High School, a school within the Poway Unified School District.

9   Defendant Poway Unified School District is a public school entity established pursuant to

10  California law.  Defendant Kastner is the Principal of Westview High School.  Defendants Phillips

11  and Chiment are the Superintendent and Assistant Superintendent, respectively, of the Poway

12  Unified School District.  The remaining Defendants, Mangum, Vanderveen, Patapow, Gutschow,

13  and Ranftle, are members of the Board of Education for the Poway Unified School District.

14        At Westview High School, Johnson is assigned a particular classroom for his math classes.

15  He uses the same classroom for extra-curricular and non-curricular activities.  Over the last two

16  decades, Johnson has continuously hung banners on the wall of his assigned classrooms.  Johnson

17  purchased and displayed the banners using his own money.  Throughout the many years that the

18  banners hung on the wall of Johnson's assigned classroom, there were no objections to the

19  presence or messages of the banners from students, parents, or school administrators – until

20  January 23, 2007.  *See* Exhibit D, Defendants' Exhibit List in Support of Motion for Summary

21  Judgment (hereinafter "Defs' Ex. List") (letter from school district to Johnson regarding reasons

22  for removal of banners).

23        Each banner is approximately seven feet wide and two feet tall.  The banners have no

24  pictures or symbols but are striped in red, white, and blue and set forth famous national phrases.

25  One banner contains the following four phrases: "In God We Trust," "One Nation Under God,"

26  "God Bless America," and "God Shed His Grace On Thee."  This banner has hung in Johnson's

27  assigned classrooms for 25 years.

28        The second banner quotes from the Declaration of Independence, "All Men Are Created

Equal, They Are Endowed By Their Creator." "Creator" is in all uppercase letters. This banner has hung in Johnson's classroom for 17 years. The banners occupy wall space with numerous photographs of nature scenes, national parks, and posters of calculus solutions.

It is undisputed that Johnson did not hang the banners as part of the curriculum he teaches, nor did he use the banners during any classroom sessions or periods of instruction. Rather, Johnson hung his banners pursuant to a long-standing Poway Unified School District policy, practice, and custom of permitting teachers to display personal messages on their classroom walls.

For at least the three decades Johnson has taught, Poway Unified School District has maintained a policy, practice, and custom of giving teachers discretion and control over the messages displayed on their assigned classroom walls. Teachers are permitted to display in their classrooms various messages and items that reflect the individual teacher's personality, opinions, and values, as well as messages relating to matters of political, social, and religious concerns so long as these displays do not materially disrupt school work or cause substantial disorder or interference in the classroom. Because of this policy, practice, and custom, teachers have used their classroom walls as an expressive vehicle to convey non-curriculum related messages.

Other teachers at the four high schools in the Poway Unified School District, including Westview High School, display in their classrooms non-educational and non-curricular messages such as:

-a 35 to 40-foot long string of Tibetan prayer flags with writings in Sanskrit and images of Buddha. Ex. 24-26, Plaintiff's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment (hereinafter "Ex. __, PUMF"); Dep. of Brickley at 87:8-18, Ex. 5, PUMF.

-a large poster of John Lennon and the lyrics to the song "Imagine":

> Imagine *there's no Heaven*, It's easy if you try
> *No hell below us, Above us only sky*
> Imagine all the people, Living for today
> Imagine there's no countries, It isn't hard to do
> Nothing to kill or die for, *And no religion, too*
> Imagine all the people, Living life in peace
> You may say that I'm a dreamer, But I'm not the only one
> I hope that someday you'll join us, And the world will be as one...

Ex. 24, PUMF (emphasis added).

-a poster of Hindu leader, Mahatma Gandhi.  Ex. 47, PUMF.

-a poster of Hindu leader, Mahatma Gandhi's "7 Social Sins":

> Politics without principle
> Wealth without work
> Commerce without morality
> Pleasure without conscience
> Education without character
> Science without humanity
> Worship without sacrifice.  Ex. 48, PUMF.

-a poster of Buddhist leader, the Dali Lama.  Ex. 49, PUMF.

-a poster that says: "The hottest places in hell are reserved for those who in times of great moral crisis, maintain their neutrality." Ex. 151, PUMF.

-posters of Muslim minister, Malcolm X.  Ex. 50-51, PUMF.

-a Greenpeace poster that says: "Stop Global Warming."  Ex. 64, PUMF.

-posters of rock bands Nirvana, Bruce Springsteen, and the Beatles.  Ex. 52-56, PUMF.

-posters of professional athletes and sports teams.  Ex. 74-80, PUMF.

-a poster of the movie "Monty Python's Quest for the Holy Grail." Ex. 86, PUMF.

-"Day of Silence" posters.  Ex. 15, PUMF.

-bumper stickers that say: "Equal Rights Are Not Special Rights," "Dare to Think for Yourself," and "Celebrate Diversity."[1]  Ex. 16, PUMF.

-a Libertarian Party poster.  Ex. 35, PUMF.

-a poster with a large peace sign and the word "peace" in several languages.  Ex. 37, PUMF.

-a mock American flag with a peace sign replacing the 50 stars and appearing to be six feet wide and four feet tall.  Ex. 39, PUMF.

-an anti-war poster that asks: "How many Iraqi children did we kill today?"  Ex. 41, PUMF.

---

[1]Ironically, while teachers in the Poway Unified School District encourage students to celebrate diversity and value thinking for one's self,  Defendants apparently fear their students are incapable of dealing with diverse viewpoints that include God's place in American history and culture.

07cv783

-a pro-defense poster of a Navy aircraft carrier that says: "Life, Liberty and the Pursuit of All Who Threaten it" and appearing to be seven feet wide and four feet tall.  Ex. 42, PUMF.

-posters of civil rights advocate Martin Luther King, Jr.  Ex. 45 & 47, PUMF.

-a large poster that says: "Zero Population Growth."  Ex. 152, PUMF.

-a large poster of an American flag with the motto: "United We Stand."  Ex. 57, PUMF.

-a large poster of an American flag that says: "...life, liberty, and the pursuit of happiness."  Ex. 58, PUMF.

-flags with the historical political motto: "Don't tread on me."  Ex. 62 & 63, PUMF.

-non-student artwork.  Ex. 81, PUMF.

-life-sized cartoon characters.  Ex. 89 & 93, PUMF.

-photographs and inspirational sayings.  Ex. 69-73, PUMF.

Teachers control the messages conveyed by their classroom displays.  Johnson's banners have caused no disruption or interference in his classroom or elsewhere in the school.  Likewise, the banners have not interfered with the basic educational mission of the school district.

In fact, over the years Johnson has taught in the Poway Unified School District, Johnson received no complaints about the banners from the many individuals who have been inside his classroom including: seven different principals, numerous school board members, superintendents, and assistant superintendents, over 4,000 students and several thousand parents of students.

Sometime in the fall of 2006, another math teacher, who may have disagreed with Johnson over pedagogy, asked Westview High School Principal Kastner why the banners were permitted.  Kastner took time considering the matter and sought direction from district administrators.  Assistant Superintendent Chiment was assigned the task of investigating the banners and reporting to the school board.  The full school board approved the decision to order Johnson to remove his classroom banners.  Chiment testified that none of the individual phrases on the banners would be a problem, rather it was the combined influence that "over-emphasized" God.  Chiment also testified that the problem was that the phrases were taken out of their original contexts.  Chiment directed that a full copy of the Declaration of Independence and pictures of U.S. coins be delivered to Johnson so that Johnson could place them on the wall instead of his banners.  Johnson declined.

- 6 -

Johnson offered to post for display the full texts from which each of the banner phrases came, around the banners.  Chiment disapproved.  Dep. of Chiment at 134:24 to 135:6, Ex. E, and Dep. of Johnson at 128:7 to 133:21, Ex. F, Defs' Ex. List.

On January 23, 2007, Kastner ordered Johnson to remove the banners, telling Johnson the banners were impermissible because they conveyed a Judeo-Christian viewpoint.  Dep. of Kastner at 137:13-21, Ex. 4, PUMF; Dep. of Chiment at 278:10-13, Ex. 3, PUMF.  Defendants singled out Johnson for discriminatory treatment because of the viewpoint of his message.  Deputy Superintendent, Dr. John P. Collins, testified about the policy permitting high school teachers to display personal messages.  Dep. of Collins, Ex. 2, PUMF.  Collins stated that neither the display of Tibetan prayer flags nor the display of the lyrics of Lennon's "Imagine" appeared to violate the Poway Unified School District's policy on posting controversial issues.  *Id.* at 90:1 to 95:25. Posters of the Dalai Lama, Mahatma Ghandi, and Ghandi's "Seven Deadly Sins" are also permissible under the policy.  Dep. of Chiment at 205:11 to 208:7, Ex. 3, PUMF.  Defendants did not claim that Johnson's banners caused disruption or disorder in the school, or that they interfered with the curriculum.  Dep. of Chiment at 49:23 to 51:14 & 276:12-25, Ex. 3, PUMF; Dep. of Kastner at 85:2 to 86:11, Ex. 4, PUMF.

Johnson wants to display the banners in his classroom; however, Defendants have prohibited him from doing so.  Had Johnson not complied with Defendants' order to remove the banners, Johnson would have suffered adverse employment consequences.  Johnson continues to teach his assigned mathematics curriculum.

### III.  ANALYSIS

"The classroom is peculiarly the marketplace of ideas.  The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, (rather) than through any kind of authoritative selection."  *Tinker v. Des Moines Indep. Cmty. School Dist.*, 393 U.S. 503, 512 (1969).

Johnson asserts six claims for relief seeking declaratory and injunctive relief as well as nominal damages.  Three of the claims rest on federal constitutional rights; three rest on similar state constitutional rights.

1     **A.      THE FREE SPEECH CLAIMS**

2          Johnson moves for summary judgment on his First Claim for Relief, that the Defendants

3     violated his First Amendment free speech rights protected by the United States Constitution.  The

4     First Amendment states: "Congress shall make no law respecting an establishment of religion, or

5     prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the

6     right of the people peaceably to assemble, and to petition the Government for a redress of

7     grievances."  U.S. Const. amend. I.  Similarly, Johnson's Fourth Claim for Relief is that

8     Defendants violated his free speech rights protected by the California Constitution.  Article 1,

9     Section 2(a) of the California Constitution reads: "Every person may freely speak, write and

10    publish his or her sentiments on all subjects, being responsible for the abuse of this right.  A law

11    may not restrain or abridge liberty of speech or press."   Cal. Const. art. 1, § 2.

12         Before discussing these contentions it is worth noting that Johnson's two banners clearly

13    constitute speech.  *Hill v. Colorado*, 530 F.3d 703, 715 (2000) (sign displays are protected by the

14    First Amendment).  Moreover, there is no dispute that Johnson's speech has been squelched by the

15    Defendants in that Johnson was ordered to remove the banners and that Johnson has complied with

16    that directive.  Defendants agree that public school teachers have First Amendment rights and that

17    the banners constitute speech for purposes of the First Amendment.  On the other hand,

18    Defendants do not agree about when or where a high school teacher may exercise his or her First

19    Amendment rights.

20              **1.  The Constitution Permits Latitude in Recognizing Religion**

21         That God places prominently in our Nation's history does not create an Establishment

22    Clause violation requiring curettage and disinfectant for Johnson's public high school classroom

23    walls.  It is a matter of historical fact that our institutions and government actors have in past and

24    present times given place to a supreme God.  "We are a religious people whose institutions

25    presuppose a Supreme Being."  *Zorach v. Clauson*, 343 U.S. 306, 313 (1952).  As the Supreme

26    Court has acknowledged, "[t]here is an unbroken history of official acknowledgment by all three

27    branches of government of the role of religion in American life from at least 1789."  *Van Orden v.*

28    *Perry*, 545 U.S. 677, 686 (2005) (quoting  *Lynch v. Donnelly,* 465 U.S. 668, 674 (1984)).

The incidental government advancement of religion is permissible.  Government speech "[s]imply having religious content or promoting a message consistent with a religious doctrine does not run afoul of the Establishment Clause." *Van Orden*, 545 U.S. 690.  "Our precedents plainly contemplate that on occasion some advancement of religion will result from government action." *Lynch*, 465 U.S. at 683 (American history is replete with official invocation of Divine guidance in pronouncements of Founding Fathers and government leaders).  "It is unsurprising that a Nation founded by religious refugees and dedicated to religious freedom should find references to divinity in its symbols, songs, mottoes, and oaths.  Eradicating such references would sever ties to a history that sustains this Nation even today." *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 35-36 (O'Connor, J., concurring).  The Constitution "permits government some latitude in recognizing and accommodating the central role religion plays in our society . . . . Any approach less sensitive to our heritage would border on latent hostility toward religion, as it would require government in all its multifaceted roles to acknowledge only the secular, to the exclusion and so to the detriment of the religious." *County of Allegheny v. ACLU*, 492 U.S. 573, 657 (1989) (Kennedy, J., concurring and dissenting).

In the case at bar, according to the undisputed evidence presented, the Poway Unified School District ran afoul of the First Amendment.  One justification was that the district feared violating the Establishment Clause.  The fear was not justified.  There is no realistic danger that an observer would think that the Poway Unified School District was endorsing a particular religion or a particular church or creed by permitting Johnson's personal patriotic banners to remain on his classroom wall.  Any perceived endorsement of a single religion is dispelled by the fact that other teachers are also permitted to display other religious messages and anti-religious messages on classroom walls.

*Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384 (1993), is applicable here: "[w]e have no more trouble than did the *Widmar* Court in disposing of the claimed defense on the ground that the posited fears of an Establishment Clause violation are unfounded...there would have been no realistic danger that the community would think that the [school] District was endorsing religion or any particular creed, and any benefit to religion or to

1    the Church would have been no more than incidental."

2

3          **2.  Public School Teacher Speech**

4          Public school teachers are unique speakers.[2]  Teachers are hired for their expertise and

5    ability to speak and convey knowledge to their students.  Yet, not all of their time during the

6    school day involves delivering curriculum.  And sometimes, while delivering curriculum, they

7    express opinions that are personal and not as speech transmitted from the government.  In *Garcetti*

8    *v. Ceballos*, 547 U.S. 410 (2006), the Supreme Court leaves open the question whether a

9    government employee-speech paradigm applies to teaching, noting, "[w]e need not . . . decide

10   whether the analysis we conduct today would apply in the same manner to a case involving speech

11   related to scholarship or teaching." 547 U.S. at 425.  It may be that the selection of school

12   curriculum is government speech.  *Downs v. Los Angeles Unified School Dist.*, 228 F.3d 1003,

13   1016 (9th Cir. 2000), *cert. denied*, 532 U.S. 994 (2001).  But to assert that because Johnson was a

14   teacher, he had no First Amendment protections in his classroom for his own speech would ignore

15   a half-century of other Supreme Court precedent.

16          **a.  *Teachers Maintain Free Speech Rights at School***

17          In 1969, the Supreme Court observed: "[i]t can hardly be argued that either students *or*

18

19
                        [2]          "To regard teachers – in our entire educational system, from the
20                   primary grades to the university – as the priests of our democracy is
                     therefore not to indulge in hyperbole.  It is the special task of teachers
21                   to foster those habits of open-mindedness and critical inquiry which
                     alone make for responsible citizens, who, in turn, make possible an
22                   enlightened and effective public opinion.  Teachers must fulfill their
                     function by precept and practice, by the very atmosphere which they
23                   generate; they must be exemplars of open-mindedness and free inquiry.
                     They cannot carry out their noble task if the conditions for the practice
24                   of a responsible and critical mind are denied to them.  They must have
                     the freedom of responsible inquiry, by thought and action, into the
25                   meaning of social and economic ideas, into the checkered history of
                     social and economic dogma.  They must be free to sift evanescent
26                   doctrine, qualified by time and circumstance, from that restless,
                     enduring process of extending the bounds of understanding and
27                   wisdom, to assure which the freedoms of thought, of speech, of inquiry,
                     of worship are guaranteed by the Constitution of the United States
28                   against infraction by national or State government."
     *Wieman v. Updegraff*, 344 U.S. 183, 196-97 (1952) (Frankfurter, J., concurring).

*teachers* shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.  This has been the unmistakable holding of this Court for almost 50 years." *Tinker* 393 U.S. at 506 (emphasis added).  In the forty years since *Tinker*, the Supreme Court has neither diminished the force of *Tinker's* observation, nor in any other way cabined the First Amendment speech of public school teachers.  In fact, the Court recently reaffirmed *Tinker*'s pronouncement.  *See Morse v. Frederick*, 551 U.S. 393, 403 (2007) ("In *Tinker*, this Court made clear that 'First Amendment rights applied in light of the special characteristics of the school environment' are available *to teachers* and students.") (emphasis added).

### b. *Student Speech Has Required Some Restrictions*

The Court has permitted limits on student speech.  For example, it is permissible to restrict student speech that "materially and substantially interfere[s]" with the requirements of appropriate discipline.  *Tinker,* 393 U.S. at 509.  Student speech has been proscribed where it consists of an "elaborate, graphic, and explicit sexual metaphor."  *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 678 (1986).  It may be banned where it "incite[s] to imminent lawless action." *Brandenburg v. Ohio*, 395 U.S. 444, 449 (1969).  Student speech that promotes illegal drug use may be silenced.  *Morse*, 551 U.S. at 410.  And student speech in an official school newspaper may be regulated, so long as it is regulated on viewpoint neutral terms.  *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260 (1988).

### c. *Teachers Enjoy Greater Freedom of Speech*

However, the speech silenced by Defendants in this case is speech by Johnson, a teacher.  In the school setting there is a qualitative lop-sided difference between the two classes of speakers (students vs. teachers).  *Bethel School Dist.*, 478 U.S. at 682 ("[T]he constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings."); *Morse*, 551 U.S. at 410-11 (Thomas, J., concurring) (describing history of American education where teachers had wide discretion to make rules and ensure student silence).  Four decades ago, the Supreme Court brushed aside the thought that teachers lose free speech rights.  "It is much too late to argue that the State may impose upon the teachers in its schools any conditions that it chooses, however restrictive they may be of constitutional guarantees."  *Epperson*, 393 U.S.

1  at 107 (citation omitted)  (holding public school teacher maintained First Amendment right to

2  communicate in the classroom his disagreement with state's required curriculum on evolution).

3  "[W]e do not confine the permissible exercise of First Amendment rights to a telephone booth or

4  the four corners of a pamphlet, or to supervised and ordained discussion in a school classroom."

5  *Tinker*, 393 U.S. at 513.

6      The decisions upon which Defendants rely do not undercut *Tinker*'s robust observation that

7  teachers do not forfeit their constitutional free speech rights while at school.  Since Johnson retains

8  First Amendment speech rights as a public school teacher, a First Amendment forum analysis is

9  the next step.

10      **3.  First Amendment Forum Analysis**

11      To determine the extent that free speech rights may be exercised on government property at

12  Westview High School, this Court engages in a First Amendment forum analysis.  *Arizona Life*

13  *Coalition, Inc. v. Stanton*, 515 F.3d 956, 968 (9th Cir. 2008), *cert. denied*, 129 S. Ct. 56 (2008)

14  ("The first step in assessing a First Amendment claim relating to private speech on government

15  property is to identify the nature of the forum.").  "The Court has adopted a forum analysis as a

16  means of determining when the Government's interest in limiting the use of its property to its

17  intended purpose outweighs the interest of those wishing to use the property for other purposes."

18  *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985); *Hills v. Scottsdale*

19  *Unified School Dist. No. 48*, 329 F.3d 1044, 1048 (9th Cir. 2003), *cert. denied*, 540 U.S. 1149

20  (2004) (To analyze First Amendment free speech claim, courts first consider what type of forum

21  the school District has created).

22      Contrary to Defendants' assertions, the *Pickering* balancing test for government employee

23  speech is the wrong test to apply in the present context.[3]  Applying a balancing test departs from

24  the First Amendment forum analysis described in *Hazelwood* and typically applied by the Ninth

25  Circuit in school speech cases.  *See e.g.*, *Truth v. Kent School Dist.*, 542 F.3d 634, 648-49 (9th Cir.

26

27

28      [3]*See also Pleasant Grove City, Utah v. Summum*, 129 S. Ct. 1125, 1139 (2009)  (Stevens, J., concurring) ("To date, our decisions relying on the recently minted government speech doctrine to uphold government action have been few and, in my view, of doubtful merit.").

2008) (applying forum analysis), *cert. denied*, 129 S. Ct. 2889 (2009); *Flint v. Dennison*, 488 F.3d 816, 830 (9th Cir. 2007), *cert. denied*, 128 S. Ct. 882 (2007) (applying forum analysis); *Hills*, 329 F.3d at 1048-50 (applying forum analysis); *but see Downs*, 228 F.3d at 1009-11 (declining to apply forum analysis because curricular speech at issue belonged to the school district).

### a.  *Three Forum Categories*

"Forum analysis has traditionally divided government property into three categories: public fora, designated public fora, and nonpublic fora." *Flint*, 488 F.3d at 830 (citation omitted).  "Once the forum is identified, we determine whether restrictions on speech are justified by the requisite standard." *Id.*  "On one end of the fora spectrum lies the traditional public forum, 'places which by long tradition . . . have been devoted to assembly and debate.' Next on the spectrum is the so-called designated public forum, which exists 'when the government intentionally dedicates its property to expressive conduct.'" *Id.* (citations omitted).  In a public or designated public forum, restrictions on speech are subject to strict scrutiny.  *Id.*

"At the opposite end of the fora spectrum is the non-public forum.  The non-public forum is 'any public property that is not by tradition or designation a forum for public communication.'" *Id.* (citations omitted).  In a non-public forum government restrictions are subjected to less-exacting judicial scrutiny.  There, a government may restrict free speech if it acts reasonably and does not suppress expression merely because public officials oppose one speaker's view.  *Id.* (citations omitted).

### b.  *The Classroom Walls of Poway's Westview High School Constitute a Limited Public Forum for Faculty Speech*

To determine the type of forum applicable to Johnson's classroom wall, the nature of the government property involved must be examined.  Judging from the undisputed facts presented, Johnson's classroom walls constitute what is best described as a *limited public forum* (a sub-category of a designated public forum) because the Poway Unified School District has intentionally opened its high schools to expressive conduct by its faculty on non-curricular subjects.  *Flint*, 488 F.3d at 831. "[A] government entity may create a forum that is limited to use

by certain groups or dedicated solely to the discussion of certain subjects." *Pleasant Grove*, 129 S. Ct. at 1132. This conclusion is based upon undisputed facts that Defendants have a long-standing policy of permitting its teachers to express ideas on their classroom walls. Defendants' policy grants its teachers discretion and control over the messages displayed on their classroom walls. Defendants' policy permits teachers to display on their classroom walls messages and other items that reflect the teacher's personality, opinions, and values, as well as political and social concerns. Defendants' policy permits teacher speech so long as the wall display does not materially disrupt school work or cause substantial disorder or interference in the classroom. As a result of the Defendants' long-standing policy, a teacher's classroom walls serve as a limited public forum for a teacher to convey non-curriculum messages.

### c. *Speech Restrictions Must be Viewpoint Neutral*

When a forum for speech is created, such as at Poway's Westview High School, government regulation of speech must be viewpoint neutral. "[O]nce a government has opened a limited forum, it must respect the lawful boundaries it has itself set." *Flint*, 488 F.3d at 831 (quoting *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1993)). A school district "may not exclude speech where its distinction is not reasonable in light of the purposes served by the forum, nor may the government discriminate against speech on the basis of its viewpoint." *Id.* (citations omitted); *see also Pleasant Grove*, 129 S. Ct. at 1132 ("In such a forum, a government entity may impose restrictions on speech that are reasonable and viewpoint-neutral"). Viewpoint neutrality requires that a school administration not favor one speaker's message over another. When "government has excluded perspectives on a subject matter otherwise permitted by the forum," the government is discriminating on the basis of viewpoint. *Faith Ctr. Church Evangelistic Ministries v. Glover*, 480 F.3d 891, 912 (9th Cir. 2007), *cert. denied*, 128 S. Ct. 143 (2007).

Here, the Poway Unified School District opened a *limited public forum* in which its teachers were permitted to exercise free speech. According to Deputy Superintendent, John P. Collins, teachers are allowed to express themselves through the posting of banners and posters and flags and other items on the classroom walls. Dep. of Collins at 38-40, Ex. 2, PUMF. By

- 14 -

1   designing, buying, hanging, and maintaining the two banners, Johnson was engaged in First

2   Amendment expression – speech otherwise permitted by the district policy.  When Defendant

3   Westview High School Principal Kastner ordered Johnson to remove the banners, she and the

4   school district were silencing speech.  When Principal Kastner ordered Johnson to remove the

5   banners "because they conveyed a Judeo-Christian viewpoint," Kastner was impermissibly

6   squelching speech based upon the viewpoint of the speaker.  The undisputed facts show that

7   Kastner's decision was not made pursuant to a content-neutral reason nor within the boundaries

8   the school district had set for itself in opening the forum.  If certain speech "fall[s] within an

9   acceptable subject matter otherwise included in the forum, the State may not legitimately exclude

10  it from the forum based on the viewpoint of the speaker." *Cogswell v. City of Seattle*, 347 F.3d

11  809, 815 (9th Cir. 2003), *cert. denied*, 541 U.S. 1043 (2004).  The Supreme Court has been clear

12  that viewpoint discrimination occurs when the government "denies access to a speaker solely to

13  suppress the point of view he espouses on an otherwise includible subject." *Cornelius*, 473 U.S. at

14  806.  Judge Fletcher distills *Cornelius* as recognizing that, "where the government is plainly

15  motivated by the nature of the message rather than the limitations of the forum or a specific risk

16  within that forum, it is regulating a viewpoint." *Sammartano v. First Judicial Dist. Court*, 303

17  F.3d 959, 971 (9th Cir. 2002).

18         Teachers other than Johnson have been permitted to use the classroom wall forum to speak

19  on a wide variety of secular and religious topics.  Topics permitted on classroom walls have

20  included religious speech from a Buddhist viewpoint in the form of Tibetan prayer flags with

21  writings in Sanskrit and an image of Buddha.  Other permitted religious speech includes the Hindu

22  viewpoint in the form of posters of Gandhi and the Hindu "seven social sins."  Anti-religious

23  speech is also permitted on classroom walls in the form of a poster with lyrics of John Lennon's

24  song "Imagine" ("Imagine there's no Heaven, it's easy if you try, no hell below us, above us only

25  sky...nothing to kill or die for, and no religion, too....").  Pro-war and anti-war topics have been

26  permitted on classroom walls.  Nationalistic and global messages find room on walls.  Other

27  patriotic posters remain in place.  Some of the speech in the form of posters are small.  Many of

28  the posters are large.  The display of Tibetan prayer flags spans the 35-40 foot width of a

1  classroom.  Faculty speech is not confined to a particular physical space such as on a bulletin

2  board or file cabinet.

3  **d.  *Johnson's Speech Was Squelched Because of its Viewpoint***

4  Only Johnson's speech has been singled out for suppression because of its message.  "In

5  cases where restriction to the forum is based solely on the group's religious viewpoint, the

6  restriction is invalid."  *Truth*, 542 F.3d at 650.  School Principal Kastner told Johnson the banners

7  had to be removed because they conveyed a "Judeo-Christian viewpoint."  School District

8  Assistant Superintendent Chiment followed up Kastner's order with a letter explaining that the

9  banners had to be removed from the classroom because they conveyed "a particular sectarian

10  viewpoint."  Deputy Superintendent Collins testified that Chiment's decision and letter to Johnson

11  were discussed with the school district Superintendent at a school district cabinet meeting and that

12  all school officials in attendance agreed with the decision.  Dep. of Collins at 58:3 - 59:3, Ex. 2,

13  PUMF.

14  The banners communicate the existence of God in our nation's history and culture.  The

15  banners communicate fundamental national historical messages.  They celebrate important shared

16  American historical experiences.  One banner contains an excerpt from the Declaration of

17  Independence, this Nation's most cherished symbol of liberty, observing: "All men are created

18  equal, they are endowed by their Creator" with unalienable rights.  Another banner repeats the

19  official motto adopted by the Congress of the United States: "In God We Trust."  The phrase,

20  "God Bless America," is often spoken by Presidents of the United States, as was the case recently

21  on January 27, 2010 where President Barack H. Obama concluded his State of the Nation address

22  with "God bless you, and God Bless America."  "God Bless America" is also a well known

23  popular American song title of the twentieth century, written by Irving Berlin and performed most

24  famously by Kate Smith.  It is routinely sung by sports fans during the seventh inning stretch at

25  New York Yankees baseball games since the attacks of September 11, 2001.  *See also, Seidman v.*

26  *Paradise Valley Unified School Dist.*, 327 F. Supp. 2d 1098, 1112 (D. Ariz. 2004) ("The phrase

27  'God Bless America,' has historic and patriotic significance.").  "God shed His grace on thee"

28  comes from the popular patriotic song and century-old poem by Katharine Lee Bates: "America,

the Beautiful," a piece most recently sung at the Super Bowl football game on February 7, 2010. The phrase, "One Nation Under God," is part of the Pledge of Allegiance.  The Pledge is recited every morning in the Poway Unified School District.  Dep. of Collins at 28:8 - 16, Ex. 2, PUMF.

Each phrase, by itself, is an acceptable message for Johnson's classroom, according to Principal Kastner.  In fact, each individual phrase was not only permitted as a message, each individual phrase was an encouraged message, in the Principal's view.  Kastner testified in her deposition that: "[t]he issue was never these phrases in isolation, and these phrases were all not only permitted but encouraged....It's taking them out of context that was the issue."  Dep. of Kastner at page 91:7-11, Ex. N, Defendants' Supplemental Exhibits in Support of Opposition to Plaintiff's Motion for Summary Judgment.

Whether correctly understood as simply historic and patriotic expressions[4] or non-proselytizing religious sayings, Defendants acted based upon their perception that the message conveyed a Judeo-Christian viewpoint.  By squelching Johnson's patriotic and religious viewpoint while permitting speech promoting Buddhist, Hindu, and anti-religious viewpoints, Defendants clearly abridged Johnson's constitutional free speech rights.  "Discrimination against speech because of its message is presumed to be unconstitutional."  *Rosenberger*, 515 U.S. at 828;  *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (Even when the government may forbid a category of speech outright, it may not discriminate on account of the speaker's viewpoint.).

In this sense, Johnson's case is similar to the decisions of *Rosenberger*, *Lamb's Chapel*, and *Good News Club v. Milford Central School*, 533 U.S. 98, 107-08 (2001).  Each case involved viewpoint discrimination in a limited public forum.  In *Rosenberger*, the Supreme Court found that by excluding funding to a student religious group solely because the religious group promoted a

---

[4]While invalidating a state-prescribed official prayer for students, the Supreme Court saw no First Amendment problem with requiring public school children to recite the Declaration of Independence with its references to God or sing anthems which include professions of faith in a Supreme Being -- describing recitations as "patriotic or ceremonial occasions."  *See Engel v. Vitale*, 370 U.S. 421, 435 n. 21 (1962) ("There is of course nothing in the decision reached here that is inconsistent with the fact that school children and others are officially encouraged to express love for our country by reciting historical documents such as the Declaration of Independence which contain references to the Diety or by singing officially espoused anthems which include the composer's professions of faith in a Supreme Being, or with the fact that there are many manifestations in our public life of belief in God.  Such patriotic or ceremonial occasions....").

particular religious perspective, the university was discriminating in a limited public forum on the basis of that group's viewpoint. *Rosenberger*, 515 U.S. at 829-37.  In *Lamb's Chapel*, a group desired to speak at a school facility on the issue of child rearing from a religious perspective.  The school district denied access to the school rooms for religious purposes.  The Supreme Court unanimously held that the school district discriminated on the basis of viewpoint, and that the school district should have permitted speech from a religious perspective on a subject permitted by the forum.  *Lamb's Chapel*, 508 U.S. at 393.  Similarly, in *Good News Club*, the Supreme Court found viewpoint discrimination where a public school excluded a Christian club from meeting on the school's grounds while at the same time permitting non-religious groups to meet.  *Good News Club*, 533 U.S. at 107-09.  The Christian club simply sought to address a subject otherwise permitted in the limited public forum  *Id.* at 109.  In *Faith Center*, the Ninth Circuit reviewed these cases and drew a line between speech from a religious perspective (which was constitutionally protected in each of the limited public forums) and pure religious worship (which exceeded the boundaries of the forums).  *Faith Center*, 480 F.3d at 913.

Whether described as speech from a religious perspective or speech about American history and culture, through display of his classroom banners, Johnson was exercising his free speech rights on subjects that were otherwise permitted in the limited public forum created by Defendants.  "Clearly, the prohibition of expression of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible."  *Tinker*, 393 U.S. at 511.  Consequently, Johnson has proved a clear  ongoing violation of his First Amendment free speech and free exercise rights.  *See, e.g., Truth*, 542 F.3d at 650 (observing that in a public high school limited public forum "where restriction to the forum is based solely on . . . religious viewpoint, the restriction is invalid.").

### 4.  Fear of Future Establishment Clause Entanglement

In the case at bar, according to the undisputed evidence presented, the Poway Unified School District ran afoul of the First Amendment.  One justification was that the district feared violating the Establishment Clause.  The fear was not justified.  There is no realistic danger that an

observer would think the Poway Unified School District was endorsing a particular religion or a particular church or creed by permitting Johnson's personal patriotic banners to remain on his classroom wall. Any perceived endorsement of a single religion is dispelled by the fact that other teachers are also permitted to display other religious messages and anti-religious messages on classroom walls. "*Widmar v. Vincent*, *Board of Education v. Mergens*, and *Lamb's Chapel*, all reject arguments that, in order to avoid the appearance of sponsorship, a school may restrict religious speech." *Hedges v. Wauconda Cmty. Utd. School Dist. No. 118*, 9 F.3d 1295, 1298 (7th Cir. 1993) (citations omitted).

Defendants then posit that the cumulative effect of the references to God on the banners might be seen as the school advancing one religion. Defendants argument is both speculative and imprecise. The messages on Johnson's banners do not describe or advance any particular religion. The banners do not quote from the Christian Bible, or books of other particular religions such as the Jewish Torah, the Islamic Koran, the Latter Day Saints Book of Mormon, the Buddhist Diamond Sutra, or the Hindu Bhagavad-Gita. To argue that the banners advance an encompassing undifferentiated religion with God as the figurehead makes sense only in a citizenry where there are only two beliefs: one acknowledging God; one denying God. Such is not the case. *See Arizona Life Coalition*, 515 F.3d at 971 (It is an "insupportable assumption that all debate is bipolar and that antireligious speech is the only response to religious speech. Our understanding of the complex and multifaceted nature of public discourse has not embraced such a contrived description of the marketplace of ideas.") (quoting *Rosenberger*, 515 U.S. at 831).

Through the Establishment Clause lens, the banners do not evangelistically advocate for the existence of God. Instead, they highlight historic and patriotic themes that in themselves have acknowledged God's existence. *Elk Grove*, 542 U.S. at 34 (O'Connor, J., concurring) ("It is unsurprising that a Nation founded by religious refugees and dedicated to religious freedom should find references to divinity in its symbols, songs, mottoes, and oaths. Eradicating such references would sever ties to a history that sustains this Nation even today."); *Aronow v. U.S.*, 432 F.2d 242, 243 (9th Cir. 1970) ("It is quite obvious that the national motto and the slogan on coinage and currency 'In God We Trust' has nothing whatsoever to do with the establishment of religion. Its

- 19 -

use is of a patriotic or ceremonial character and bears no true resemblance to a governmental

sponsorship of a religious exercise.").  One teacher's banners that direct attention to the multiple

places God may be found in our country's history, does not evidence an Establishment Clause

violation.  Consequently, the Defendants' explanation and justification for removing Plaintiff's

speech for fear of violating the Establishment Clause is unconvincing – especially among the

cacophony of other First Amendment speech which remains in the high school classrooms.[5]  *Cf.*

*Hills*, 329 F.3d at 1053 (school district failed to demonstrate that the Establishment Clause would

be violated).  Ultimately, "the school district here can dispel any 'mistaken inference of

endorsement' by making it clear to students that . . . private speech is not the speech of the

school."  *Prince v. Jacoby*, 303 F.3d 1074, 1094 (9th Cir. 2002) (quoting *Bd. of Educ. v. Mergens*,

496 U.S. 226, 251 (1990) (plurality opinion) (school's fear of endorsing private religious speech is

largely self-imposed because school has control over impressions its gives to secondary school

students).

---

[5]Our diversity is one of our strengths.  It is laudable that the Defendants have created a forum for faculty speech.  Our high school students are well served by encouraging them to enter the marketplace of ideas and become wise consumers.  A democratic society must "of course, include tolerance of divergent political and religious views."  *Bethel School Dist.*, 478 U.S. at 681.  One way a school district can be confident that it is not endorsing religion is to permit speech and then educate students about the dangers of restricting speech.  The Seventh Circuit noted:

> What means do schools have at their disposal to fulfil this obligation? The principal method is for administrators to avoid endorsing religious views by their own words or deeds; a prudent administrator also might disclaim endorsement of private views expressed in the schools.  This combination discharges the school's obligation to be neutral toward religious sentiment.  Just as a school may remain politically neutral by reminding pupils and parents that it does not adopt the views of students who wear political buttons in the halls or public officials who tout their party's achievements in the auditorium, so a school may remain religiously neutral by reminding pupils and parents that it does not adopt the views of students who pass out religious literature before school.  It must refrain from promoting the distribution of such literature but can remain neutral by treating religious speech the same way it treats political speech.  *Wauconda Cmty. Utd. School Dist.*, 9 F.3d at 1299.

The Ninth Circuit agrees.  "We agree with the Seventh Circuit that the desirable approach is not for schools to throw up their hands because of the possible misconception about endorsement of religion, but that instead it is 'far better to teach students about the first amendment, about the difference between private and public action, about why we tolerate divergent views.  The school's proper response is to educate the audience rather than squelch the speaker.'"  *Hills*, 329 F.3d at 1055 (quoting *Wauconda Cmty. Utd. School Dist.*, 9 F.3d at 1299).

### **5.  *Pickering* or *Tinker* – Government Speech or Individual Speech?**

Defendants adopt the alternate argument that Johnson gave up his free speech rights by virtue of his employment as a public high school teacher.  The argument is at odds with *Epperson, Tinker* and *Morse*.  Nevertheless, Defendants argue that Johnson's free speech rights may be abridged because he is a government employee, and because a teacher is also a government employee, a government speech test from *Pickering v. Bd. of Educ.,* 391 U.S. 563 (1968), should be used rather than *Tinker's* First Amendment forum analysis.  It is true that the Free Speech Clause does not apply to the government's own speech.  *Pleasant Grove*, 129 S. Ct. at 1131.  Where a government employee is speaking while doing his or her government job, it is sometimes characterized as the government's own speech.  *Garcetti*, 547 U.S. 410.  But not all speech by a government employee is government speech.  A government employee may be engaged in his or her own private speech while on government property.  Consequently, while "government speech is not restricted by the Free Speech Clause, the government does not have a free hand to regulate private speech on government property."  *Pleasant Grove*, 129 S. Ct. at 1132.  Thus, "[t]here may be situations in which it is difficult to tell whether a government entity is speaking on its own behalf or is providing a forum for private speech."  *Id.*

Defendants argue that the balancing test from *Pickering* should be applied, and if applied, would leave Johnson's speech unprotected by the First Amendment.  *Pickering* addressed a public school teacher's speech that criticized his government employer.  In that situation, the Court sought to balance the employee's interests as a citizen against the government interest as employer in promoting efficiency of providing governmental services.  It is significant that, in the end, *Pickering* reinforces the understanding that a teacher's speech enjoys constitutional protection.  *Pickering*, 391 U.S. at 568 ("To the extent that the Illinois Supreme Court's opinion may be read to suggest that teachers may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work, it proceeds on a premise that has been unequivocally rejected in numerous prior decisions of this Court.").  All of the decisions of the Supreme Court touching on the subject acknowledge a teacher's right to engage in

1    protected speech.  No Supreme court decision holds to the contrary.  Therefore, Defendants'

2    position that the *Pickering* balancing test applies and justifies silencing Johnson's speech, finds no

3    traction in Supreme Court case law.

**a.  Even <u>*Pickering*</u> *Balancing Tips in Favor of Plaintiff's Banners***

**i.  The Ninth Circuit *Nicholson* Case**

6            Though Defendants do not cite it, the Ninth Circuit did look to *Pickering* in a teacher's

7    wrongful discharge suit.  *See Nicholson v. Bd. of Educ. Torrance Unified School Dist.*, 682 F.2d

8    858 (9th Cir. 1982).  In that case, Nicholson was hired as a probationary high school journalism

9    teacher.  The probationary period was filled with disputes with the administration over articles

10   published in the school newspaper, failures to comply with record-keeping requirements, and

11   instances where he permitted students to violate school rules.  The school did not rehire Nicholson

12   and he sued.  *Id.* at 861-62.  Nicholson claimed that he was not rehired because of his exercise of

13   free speech rights.  In that context, the court of appeals looked to *Pickering*, writing, "[t]he

14   question whether a school teacher's speech is constitutionally protected expression requires

15   balancing.  *Id.* at 865 (quoting *Pickering*, 391 U.S. at 568).  The court of appeals focused on three

16   factors drawn from *Pickering*.  One factor was whether the speech affected the teacher's working

17   relationships with the school board and his immediate superiors.  *Id.*  A second factor was whether

18   the teacher's expression "impeded the teacher's proper performance of his daily duties in the

19   classroom."  *Id.*  The third factor looked at whether the teacher's expression "interfered with the

20   regular operation of the school generally."  *Id.*

21           Johnson's banners easily pass this three-factor test.  Concerning the first factor, there is no

22   evidence that working relationships with the school board or the principal deteriorated.  In fact,

23   testimony indicated that his superiors were favorably impressed with the professional manner in

24   which Johnson responded to administration concerns over the banners.  *See* Chiment Letter dated

25   Jan. 23, 2007, Ex. D, Defs' Ex. List ("Let me first say that I am pleased with the professional

26   manner in which you are dealing with these directions.")  The second factor asks about the

27   performance of daily duties in the classroom.  Here the evidence clearly demonstrates that the

28   banners had no effect on the performance of Johnson's daily duties in the classroom.  In fact,

1    Johnson has been held in high regard for his performance of daily duties teaching math while his

2    banners were displayed.  The final factor looks at whether the speech in question interfered with

3    the regular operation of the school generally.  Again, there was no evidence offered to suggest the

4    banners negatively affected the regular operation of the schools where Johnson taught.  To the

5    contrary, the undisputed evidence demonstrated that the school administration had no issue with

6    the display of Johnson's banners for two decades.  Thus, even applying the *Pickering* test, as

7    understood by *Nicholson*, the Court would find Johnson's banner display to be constitutionally

8    protected.

9                          **ii.  The Ninth Circuit *Berry* Case**

10           Defendants also assert that *Berry v. Dept. of Social Servs.,* 447 F.3d 642 (9th Cir. 2006),

11   provides the better roadmap.  *Berry* is not a teacher case.  *Berry* dealt with a worker who would

12   speak with unemployed citizens making the transition out of welfare.  At issue was an agency

13   restriction on discussing religion with citizens served by the agency and displaying religious items

14   in worker cubicles.  *Id.* at 646.  Mr. Berry desired to speak with citizens at the agency, to share his

15   faith and pray.  *Id.*  The court applied a modified *Pickering* balancing test.  *Berry* balanced the

16   employee's right to engage in First Amendment religious speech against the government

17   employer's need to avoid a violation of the Establishment Clause.  *Id.* at 650-51.  In that speech

18   context, the Ninth Circuit found that the balance tipped in the government agency's favor.  The

19   potential for an Establishment Clause issue was greater there, than here, as the employee in *Berry*,

20   unlike Johnson, said he would share his faith and pray with agency customers.  *Id.*  In contrast, the

21   classroom banners do not contain Johnson's own prayers or a statement of his own religious faith.

22   Nor does the record indicate that Johnson prays with students during class time.

23           *Berry* also addressed the government-employer's right to restrict the employee's right to

24   decorate his cubicle with religious items.  Mr. Berry wanted to display a Bible and a "Happy

25   Birthday Jesus" sign at his cubicle.  Relying on its earlier decision in *Tucker v. California Dept. of*

26   *Educ.*, 97 F.3d 1204 (9th Cir. 1996), *Berry* again found the balance tipped in favor of the agency

27   and its ban on religious decorations.  447 F.3d at 651-52.

28                          **iii.  The Ninth Circuit *Tucker* Case**

1    In contrast to *Berry*, in *Tucker* the Ninth Circuit used a forum analysis, rather than a

2    balancing test, in analyzing a First Amendment challenge to a complete ban on the display of

3    religious materials.  The issue involved the display of religious messages on the walls of the

4    offices and employee cubicles at the California state department of education.  *Tucker*, 97 F.3d at

5    1214-15.  *Tucker* struck down the government ban on displays.  As Judge Reinhardt said, "[w]e

6    conclude that it is not reasonable to allow employees to post materials around the office on all

7    sorts of subjects, and forbid only the posting of religious information and materials."  *Id.* at 1215.

8    The prohibition was an impermissible restriction on speech because "its sole target" was religious

9    speech.  *Id.*  Even otherwise reasonable restrictions on speech in a non-public forum must be

10   viewpoint neutral.  *Id.*

11   In language equally applicable to the classrooms of Westview High School, *Tucker*

12   observed, "[r]easonable persons are not likely to consider all of the information posted on bulletin

13   boards or walls in government buildings to be government-sponsored or endorsed.  Certainly a

14   total ban on posting religious information of any kind is an unreasonable means of obviating such

15   a concern."  *Id.*

16   In the case at hand, the ban on Johnson's banners is an unreasonable restriction on

17   constitutionally protected teacher speech because, as was the case in *Tucker*, the school district ban

18   is not viewpoint neutral.  Principal Kastner did not ban all teacher classroom wall displays.

19   Kastner did not ban only religious displays – a restriction that by itself would be suspect under

20   *Tucker*.  Instead, Kastner banned Johnson's banner display because of its particular religious

21   perspective.  At the same time, Kastner permitted on other classroom walls: (1) the 35-40 foot long

22   Tibetan prayer flag display and its representation of Buddha; (2) the Gandhi seven social sins

23   poster; and (3) the Lennon "Imagine" anti-religious song poster.  These types of viewpoint and

24   content-based restrictions on First Amendment speech do not pass even minimal Constitutional

25   screening.

### iv.  The Ninth Circuit *Peloza* Case

27   Defendants argue that a public school district may prevent a teacher from engaging in

28   evangelical speech on a school campus if necessary to avoid an Establishment Clause violation,

relying on *Peloza v. Capistrano Unified School Dist.*, 37 F.3d 517 (9th Cir. 1994).  The argument does not apply to the facts here.  Unlike in *Peloza*, there is no evidence Johnson was evangelizing during instructional time.  *Peloza* recognized a permissible limit on free speech where a school district directed a teacher "to refrain from any attempt to convert students to Christianity or initiating conversations about [his] religious beliefs during instructional time."  *Peloza*, 37 F.3d at 522.  The *Peloza* context is significantly different than the silent display of banners context.  The difference is further amplified by the milieu of teacher expression on classroom walls found in Johnson's school.  The Plaintiff's banners are not patently evangelical.  They do not contain scripture from any holy text.  There is no proselytizing language.  Although the word "God" appears several times, it is in its historically employed context.  In view of the much different context, *Peloza* sheds little light for the First Amendment issues at play here.

### b.  *Johnson's Speech is Not Curricular*

Defendants also argue that Johnson's classroom wall banners are curricular speech.  From this Defendants argue that if the banners are curricular speech, then the Poway Unified School District has absolute control over the curriculum and may dictate the content of what its teachers may or may not speak.  Any support for this argument would come from the Ninth Circuit decision in *Downs*.  But *Downs* also arises from a much different context.  In that case, a school district decided to set up bulletin boards in its schools upon which to post materials with the aim of "Educating for Diversity."  228 F.3d at 1012.  The bulletin boards were supplied by the school district and erected in the school hallways.  The materials to be posted on the bulletin boards were supplied by the school district, and because the school district had final authority over the content of the boards, all speech that occurred on the bulletin boards belonged to the school board and the school district.  *Downs* involved only government speech in a nonpublic forum.  *Id.* at 1013.  "We do not face an example of the government opening up a forum for either unlimited or limited public discussion.  Instead, we face an example of the government opening up its own mouth."  *Id.* at 1012.  In that particular context, *Downs* held that a teacher's free speech rights did not extend to postings on the diversity bulletin boards.  *Id.* at 1014.

That is a different case than the one presented here.  Unlike the teacher in *Downs*, Johnson

1  supplied the banners – not the school district.  Johnson selected the content of the banners – not

2  the school district.  Johnson hung the banners inside his assigned classroom.  The Poway Unified

3  School District created a *limited public forum* for teacher expression.  Johnson was expressing his

4  ideas in that forum in a manner that remarkably brought no complaints from students or parents or

5  other teachers and school administrators for two decades.  This was not a case of the school district

6  electing to speak for itself on a topic as part of its selected curriculum.  *Downs* is inapposite.

7        To sum up, it is axiomatic that the school district may not regulate speech based on the

8  message it conveys.  *Rosenberger*, 515 U.S. at 828 (citations omitted).  From this principle follows

9  the precept that for private speech or expression, government regulation may not favor one speaker

10  over another.  *Id.*  Where there has been discrimination against private speech because of its

11  message, it is presumed to be unconstitutional.  *Id.*  In cases where a school targets the particular

12  views taken by a speaker on a subject, the First Amendment violation is all the more blatant.  *Id.* at

13  829.  "Viewpoint discrimination is thus an egregious form of content discrimination."  *Id.* These

14  principles forbid a school district from exercising viewpoint discrimination, even when the limited

15  public forum is one of its own creation.  *Id.*  Here, the Poway Unified School District engaged in

16  viewpoint discrimination when it required Johnson to remove his banners, and thus violated his

17  First Amendment free speech rights.

18        In conclusion, there being no genuine issues of material fact, Plaintiff is entitled to

19  summary judgment on his First Claim for Relief under the federal First Amendment to the United

20  States Constitution.

21        Johnson's Fourth Claim for Relief under the California Constitution is likewise determined

22  by First Amendment jurisprudence.  Therefore, Plaintiff's motion for summary judgment on the

23  Fourth Claim for Relief is also granted.  *San Leandro Teachers Ass'n v. Governing Bd. of the San*

24  *Leandro Unified School Dist.*, 46 Cal. 4th 822 (Cal. 2009) (applying both federal First Amendment

25  analysis to interpret state's liberty of speech clause in public school speech forum, and

26  alternatively observing that protections granted by California's Constitution are broader).

27  **B.  THE ESTABLISHMENT CLAUSE CLAIMS**

28        Johnson's Second and Sixth Claims for relief assert Defendants violated the Establishment

Clause of the First Amendment and the California Constitution.  Johnson's claim is simple: by

squelching his classroom banners because they conveyed a Judeo-Christian viewpoint, while at the

same time permitting the classroom displays of other teachers about Buddhist and Hindu religions,

Defendants are using the weight of government to prefer other religions while expressing hostility

toward his own religion.  This, of course, the Establishment Clause forbids.

"The clearest command of the Establishment Clause is that one religious denomination

cannot be officially preferred over another."  *Larson v. Valente*, 456 U.S. 228, 244 (1982).

Likewise, silencing religious speech while permitting speech that is anti-religious (*i.e.*, the lyrics to

Lennon's "Imagine") also violates the Establishment Clause.  *School Dist. of Abington Twp., v.

Schempp*, 374 U.S. 203, 225 (1963) ("We agree of course that the State may not establish a

'religion of secularism' in the sense of affirmatively opposing or showing hostility to religion, thus

'preferring those who believe in no religion over those who do believe.'").

Defendants suggest that they were maintaining religious neutrality.  The undisputed facts

paint a different picture.  To recap, other teachers are permitted to display Buddhist messages and

an image of Buddha, large Tibetan prayer flags displays, Hindu messages, and anti-religious

messages.  Such speech is obviously religious.  At the same time, Johnson's banners, with their

Judeo-Christian viewpoint, are no longer permitted.  The undisputed evidence demonstrates an

absence of government neutrality: disfavor towards Johnson's Judeo-Christian viewpoint and

favor toward other religious viewpoints and viewpoints hostile towards religion.

The given reason was the sectarian viewpoint expressed by Johnson's banners.  At oral

argument, counsel for defendants offered different explanations for ordering the banners to be

taken down.  It was argued that it was the large size of the banners that is the problem.  Yet, there

are other large displays on classroom walls.  The Tibetan prayer flags reach 35-40 feet across

another classroom.  It was then argued that it is the repetitive inclusion of the word "God" in the

phrases on the banners that might make an Islamic student uncomfortable.  Principal Kastner said

that she asked Johnson, "[i]f an Islamic student walks into your classroom and sees all of these

phrases...they may feel like, Wow, I'm not welcome, or, I'm not gonna fit in this classroom.  And

they may feel bad."  Dep. of Kastner at 44:4-11, Ex. F, Defs' Ex. List.

07cv783

Of course, student comfort is not a Constitutional test.  "After all, much political and religious speech might be perceived as offensive to some."  *Morse,* 551 U.S. at 409.  "In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."  *Tinker*, 393 U.S. at 509.  More to the point, an imaginary Islamic student[6] is not entitled to a heckler's veto on a teacher's passive, popular or unpopular expression about God's place in the history of the United States.  *See Morse*, 551 U.S. at 402-404 (a school's desire to avoid controversy, which might result from unpopular viewpoints is not enough to justify banning, "silent, passive expression of opinion, unaccompanied by any disorder or disturbance.").

Even if the Defendants were applying some sort of student-discomfort test, they would have to apply the test equally.  Yet, school district administrators did not ask, for example, whether a Muslim student might feel uncomfortable sitting in a classroom with the anti-religious lyrics from "Imagine"[7] on a classroom wall poster.  Did the principal ask whether a Jewish or Christian student might feel uncomfortable sitting under a string of Tibetan prayer flags inscribed with Sanskrit and an image of Buddha?  The undisputed evidence supports a finding of unconstitutional selective protectionism: "protecting" students from Johnson's "Judeo-Christian" viewpoint while tolerating, if not endorsing, other religious and anti-religious viewpoints.

It was also argued that no district administrator noticed Johnson's banners until 2006-07.  Yet, the undisputed evidence is that Johnson's banners were large and on display in his classrooms for two decades.  The assertion is patently untenable.

Finally, defense counsel argued that the Tibetan *prayer* flags are just "decorative."  They are not a religious display because the Sanskrit was not translated, the image of Buddha was small, and Buddhism is not a religion but a philosophy of life.  The argument is a transparent pretext.  For example, the U.S. State Department estimates that in China alone there are more than 100 million

---

[6]There was no actual complaint from an Islamic student or any other student.

[7]See *Pleasant Grove*, 129 S. Ct. at 1135 & n.2.

1  Buddhists, making Buddhism one of the largest organized religions.[8]  The image of Buddha may

2  be small, but it is a recognizable religious image, nonetheless.  Finally, the fact that a student may

3  not know how to translate from Sanskrit to English, does not change the inferential religious

4  significance of the *prayer* flags.

5      As the Ninth Circuit explained in another public school setting where the Establishment

6  Clause was violated, "[t]he message of an open-forum policy is one of neutrality."  *Ceniceros v.*

7  *Bd. of Trustees of the San Diego Unified School Dist.*, 106 F.3d 878, 882 (9th Cir. 1997).

8  "[D]iscriminating against religious groups would demonstrate hostility, not neutrality, toward

9  religion."  *Id.*; *County of Allegheny*, 492 U.S. at 593 (Establishment Clause inquiry is whether the

10  government "conveys or attempts to convey a message that religion or a particular religious belief

11  is favored or preferred.").  Here, Johnson has successfully proven an Establishment Clause claim

12  by demonstrating that Defendants are not neutral toward teachers' religious displays.  Defendants'

13  endorsement of Buddhist, Hindu, and anti-religious speech by some teachers while silencing the

14  Judeo-Christian speech of Johnson, violates the Establishment Clause.

15      Therefore, Plaintiff's motion for summary judgment is granted on the Second Claim for

16  Relief for violation of the federal Establishment Clause of the United States Constitution.  Because

17  Johnson's Sixth Claim for Relief under the California Constitution is determined by federal First

18  Amendment jurisprudence, Plaintiff's motion for summary judgment on the Sixth Claim for Relief

19  is also granted.  *Paulson v. Abdelnour*, 145 Cal. App. 4th 400, 420 (2006) ("The construction

20  given by California courts to the establishment clause of article I, section 4, is guided by decisions

21  of the United States Supreme Court.").

22  **C.  THE STATE "NO PREFERENCE" CLAUSE CLAIM**

23      Johnson's Fifth Claim for Relief asserts a claim solely under the California Constitution's

24  No Preference Clause.  The No Preference Clause reads: "Free exercise and enjoyment of religion

25

26  _____

27  [8]U.S. Department of State, International Religion Freedom Report 2006, China, available at www.state.gov/g/drl/rls/irf/2006/71338.htm last viewed on February 25, 2010.

28  The teacher with the Tibetan *prayer* flag display said that she did not "have any idea" what the Sanskrit writing meant, but admitted that she would not be surprised to learn that the *prayer* flags contain sacred text and prayers of Buddhists.  Dep. of Brickley at 89:4 to 90:20, Ex. J, Defs' Ex. List.

without discrimination or preference are guaranteed."  Cal. Const. art. I, § 4.  "The California

courts have interpreted the no preference clause to require that not only may a governmental body

not prefer one religion over another, it also may not appear to be acting preferentially."  *Tucker*, 97

F.3d at 1214 (citations omitted).  While, the California Supreme Court has not definitively

construe the reach of the clause, (*see Barnes-Wallace v. City of San Diego*, 530 F.3d 776, 788

(9th Cir. 2008), *reh'g en banc denied*, 551 F.3d 891 (2008)), since Johnson has adequately

demonstrated through undisputed facts that Defendants acted in a way that either prefers, or

appears to prefer, Buddhist, Hindu, and anti-religious viewpoints over Johnson's Judeo-Christian

viewpoint, he has successfully proven the claimed violation of California's No Preference Clause.

Thus, Plaintiff's motion for summary judgment on the Fifth Claim for Relief is granted.

## D.  THE EQUAL PROTECTION CLAUSE CLAIM

Johnson's remaining claim for relief is the Third Claim asserting a violation of the Equal

Protection Clause of the Fourteenth Amendment.  The Supreme Court teaches that "[w]hen

government regulation discriminates among speech-related activities in a public forum, the Equal

Protection Clause mandates that the legislation be finely tailored to serve substantial state interests,

and the justifications offered for any distinctions it draws must be carefully scrutinized."  *Carey v.

Brown*, 447 U.S. 455, 461-62 (1980).  In *Police Department v. Mosley*, 408 U.S. 92, 95-96 (1972),

the Court explains:

> Necessarily, then, under the Equal Protection Clause, not to mention the First
> Amendment itself, government may not grant the use of a forum to people whose
> views it finds acceptable, but deny use to those wishing to express less favored or
> more controversial views.  And it may not select which issues are worth discussing
> or debating in public facilities.  There is an "equality of status in the field of ideas,"
> and government must afford all points of view an equal opportunity to be heard.
> Once a forum is opened up to assembly or speaking by some groups, government
> may not prohibit others from assembling or speaking on the basis of what they
> intend to say.  Selective exclusions from a public forum may not be based on
> content alone, and may not be justified by reference to content alone.

As to the Third Claim for Relief, there are no genuine issues of material fact.  Plaintiff has

proven his claim that Defendants violated his rights under the Equal Protection Clause.

Defendants opened up a forum for teacher expression.  Having maintained the forum for decades,

Defendants violated Johnson's rights when they acted to prohibit his speech and order his banners

07cv783

1  removed based on the content and viewpoint of what he was expressing – while at the same time

2  permitting other teacher speech from a variety of other viewpoints to continue unfettered.  Thus,

3  on the Equal Protection claim, Plaintiff is entitled to summary judgment.

4  **E.  QUALIFIED IMMUNITY**

5          The individual Defendants argue that they are entitled to qualified immunity.  A school

6  official is entitled to qualified immunity where clearly established law does not show that the

7  action taken violates federal Constitutional rights.  *Safford Unified School Dist. No. 1 v. Redding*,

8  129 S. Ct. 2633, 2643 (2009).  "To be established clearly, however, there is no need that the very

9  action in question [has] previously been held unlawful."  *Id.* (citation omitted).  In fact, "the easiest

10  cases don't even arise."  *Id.* (citation omitted).  School officials "can still be on notice that their

11  conduct violates established law in novel factual circumstances."  *Id.* (citation omitted).  The task

12  is determining whether the preexisting law provided the defendants with "fair warning" that their

13  conduct was unlawful.  *Hope v. Pelzer*, 536 U.S. 730, 740 (2002).

14          In this case, the law has been clearly established since *Tinker* that school teachers enjoy

15  First Amendment rights inside the schoolhouse gates.  *Morse*, 551 U.S. at 396.  It is also clearly

16  established law that where free speech is permitted, the government may not discriminate based on

17  the speaker's viewpoint.  *Rosenberger*, 515 U.S. at 828-29 (citations omitted); *see also Citizens*

18  *United v. Fed. Election Comm'n*, No. 08-205, __ U.S. __, 2010 WL 183856, *19 (Jan. 21, 2010)

19  ("[T]he First Amendment stands against attempts to disfavor certain subjects or viewpoints.").

20  Finally, as Justice Souter wrote, it is clearly established that in matters of religion, "the First

21  Amendment mandates government neutrality between religion and religion, and between religion

22  and nonreligion."  *McCreary County v. ACLU*, 545 U.S. 844, 860 (2005) (citations omitted).

23          The school district and its administration apparently acted in conformity with these

24  established principles for two decades.  When Defendants suddenly changed course in 2007, a

25  course they continue on today, they did so in violation of clearly established federal and state

26  constitutional law and with fair warning that their conduct was unlawful.  The individual

27  Defendants are not entitled to qualified immunity from suit.

28                    **IV.  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

1    Because the undisputed material facts demonstrate that Plaintiff is entitled to judgment of

2    each of his claims for relief, Defendants' cross-motion for summary judgment is denied.

3                                    **V.  CONCLUSION**

4    Plaintiff's motion for summary judgment is granted as to all claims for relief; Defendants'

5    motion for summary judgment is denied as to all claims for relief.  Plaintiff is entitled to a

6    declaration that Defendants have violated Plaintiff's individual rights protected by the First and

7    Fourteenth Amendments to the United States Constitution, and Article I, §§ 2 and 4 of the

8    California Constitution.

9    Plaintiff is entitled to nominal damages in the amount of $10 per individual Defendant.

10   Plaintiff is entitled to an award of reasonable attorney's fees and costs .

11   Defendants are ordered to permit Johnson to immediately re-display, in his assigned

12   classroom, the two banners at issue in this case.

13   DATED:  February 25, 2010

14

15

16   _____
     Hon. Roger T. Benitez
     United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28

07cv783